# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 734 | **DATE** | 1/16/2003 |
| **CASE TITLE** | LaSalle National Bank Assoc. vs. Mehdi Gabayzedeh | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Plaintiff's Motion for Summary Judgment is GRANTED. The Court hereby enters judgment for LaSalle. In accordance with the Memorandum Opinion and Order LaSalle shall submit affidavit(s) and other appropriate supporting documentation within 14 days of receipt of this Memorandum Opinion and Order; Gabayzedeh shall have 7 days to respond.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | JAN 1 7 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | 29 |
| | Copy to judge/magistrate judge. | | | |
| WAP | courtroom deputy's initials | 03 JAN 17 AM 8:06 U.S. DISTRICT COURT CLERK | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
JAN 1 6 2003

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

LaSALLE NATIONAL BANK
ASSOCIATION, a National Banking
Association,

        Plaintiff,

v.

MEHDI GABAYZEDEH, an
individual,

        Defendant.

Case No. 02 CV 734

Hon. Harry D. Leinenweber

JAN 1 7 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff LaSalle National Bank Association ("LaSalle") brings this action against Mehdi Gabayzedeh ("Gabayzedeh") seeking a declaratory judgment that Gabayzedeh's obligations under that certain Continuing Unconditional Guaranty dated July 12, 2001 entered into by and between Gabayzedeh and LaSalle (for itself and as agent for certain other lenders)(the "Guaranty") are "presently due and owing" to LaSalle. The Court's subject matter jurisdiction rests on 28 U.S.C. § 1332. Presently before the Court is LaSalle's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the Court grants the motion.

## MOTION FOR SUMMARY JUDGMENT

### *Legal Standard*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file,

29

together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). A fact is "material" if it could affect the outcome of the suit under the governing law; a dispute is "genuine" where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Supreme Court has emphasized "that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue [of material fact] for trial." *Id.* at 249. In performing this task, all factual disputes are resolved, and all reasonable inferences are drawn, in favor of the nonmoving party. *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002). However, "[s]elf-serving assertions without factual support in the record will not defeat a motion for summary judgment." *Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054, 1058 (7th Cir. 1994).

The burden is initially upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the moving party believes demonstrate an absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party may not rest upon the mere allegations contained in the nonmoving party's pleading, but rather "must set forth specific facts showing that

there is a genuine issue for trial." FED.R.CIV.P. 56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir. 1989). Accordingly, summary judgment is mandatory "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. In such a situation, there can be "'no genuine issue as to any material fact', since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

### *Failure to Respond to Statement of Uncontested Material Facts*

Invoking his Fifth Amendment right against self-incrimination, Gabayzedeh has offered no response to LaSalle's version of the material facts in this case. Federal Rule of Civil Procedure 56(e) is clear, however, that once a summary judgment motion "is made and supported as provided in [Rule 56]," the nonmoving party must respond by "set[ting] forth specific facts showing there is a genuine issue for trial. If the [nonmoving] party does not so respond, summary judgment, if appropriate, shall be entered against the [nonmoving] party." FED.R.CIV.P. 56(e); *see also Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)(Under Rule 56(e), "if the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material

- 3 -

question, then the court *must* enter summary judgment against her." (emphasis in original)). This fundamental rule is no less applicable where the non-movant's failure to respond is the consequence of his assertion of the Fifth Amendment privilege. *See LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391 (7th Cir. 1995).

Under Local Rule 56.1(a)(3) of the Local Rules of the United States District Court for the Northern District of Illinois, a party moving summary judgment must submit a statement of material facts in the form of short numbered paragraphs supported by specific references to the factual record. LaSalle has done so. Under Local Rule 56.1(b)(3), the nonmoving party must in turn submit a response to each such paragraph, including (in the case of disagreement) specific references to the factual record. Gabayzedeh, invoking the Fifth Amendment, has failed to do so. Gabayzedeh's refusal to respond carries drastic consequences, as "[a]ll material facts set forth in the statement required of the moving party will be deemed to be *admitted* unless controverted by the statement of the opposing party." Local Rule 56.1(b)(3)(B) (emphasis supplied); *see also Seguban*, 54 F.3d at 391 (holding that, notwithstanding a non-movant's "Fifth Amendment silence," "admission[s] . . . achieved automatically through operation of [Local Rule 56.1(b)] . . . do[] not . . . overstep the bounds of constitutional acceptability").

The Seventh Circuit has explicitly "endorsed the exacting obligation[s] these [local] rules impose on a party contesting summary judgment" and has "repeatedly upheld the[ir] strict

enforcement . . . , sustaining the entry of summary judgment when the non-movant has failed to submit a factual statement in the form called for by the pertinent [local] rule and thereby conceded the movant's version of the facts." *Waldridge*, 24 F.3d at 922. As the Seventh Circuit has acknowledged, "district courts are not obligated in our adversary system to scour the record looking for factual disputes." *Id.* Likewise here, the Court will not scour the record on Gabayzedeh's behalf. Rather, the Court accepts as undisputed LaSalle's properly supported statements of material fact contained in its Local Rule 56.1(a)(3) Statement of Uncontested Material Facts. The Court's task then becomes to determine whether, "given the undisputed facts, summary judgment is proper as a matter of law." *Wienco, Inc. v. Katahn Assocs., Inc.*, 965 F.2d 565, 568 (7th Cir. 1992).

## **BACKGROUND**

On or about July 9, 1999, LaSalle, as a lender and as agent for a group of lenders, entered into an Amended and Restated Loan Agreement (the "Loan Agreement") with American Tissue, Inc. ("ATI") and certain companies affiliated with ATI (collectively, the "Borrowers"). At that time, Gabayzedeh was President, Chief Executive Officer and an indirect fifty-percent stockholder of ATI. The Loan Agreement provided the Borrowers with a revolving credit facility secured by, among other things, the Borrowers' inventory and accounts receivable. This credit facility was subject to a "Loan Limit," defined as the lesser of (i) $100,000,000 and (ii) a defined

percentage of eligible accounts receivable and inventory ("A/R & I Amount"). (See Loan Agmt., Exh. A.) On May 3, 2000, the Loan Limit's $100,000,000 cap was increased to $145,000,000. By the terms of the Loan Agreement, the Borrower's "Liabilities" (a term capaciously defined in the Loan Agreement to include, *inter alia*, "any and all obligations, liabilities and indebtedness of each Borrower to [LaSalle] or any [other lender party to the Loan Agreement]") were not to exceed the Loan Limit; if they did, the Borrowers were required to pay down that excess amount (the "Overadvance") "immediately, and without any necessity of a demand by [LaSalle]" (see Loan Agmt. at 10-11), on pain of triggering an "Event of Default" (see Loan Agmt. at 28-29).

As of early June 2001, the Borrowers' Liabilities under the Loan Agreement had in fact exceeded the Loan Limit, and the Borrowers did not have sufficient funds to pay down this Overadvance. Gabayzedeh and the other Borrowers, aware of this "out-of-margin" financial condition, entreated LaSalle in June and July 2001 not to declare an "Event of Default" under the Loan Agreement at that time, in part out of fear that it would cripple a public bond deal then being negotiated with UBS Warburg. LaSalle obliged, and between early June 2001 and July 12, 2001, LaSalle (as well as the other lenders party to the Loan Agreement) began considering requests from the Borrowers for additional funding on a day-to-day basis. Some of those requests were granted.

During a conference call on June 21, 2001 with LaSalle and the other lenders, Gabayzedeh, in an apparent effort to assuage LaSalle's concern about the Borrowers' inability to pay down the persisting Overadvance, proposed that he provide a guaranty for that amount. This idea appealed to LaSalle and the other lenders, and in fact became a condition precedent to the closing of a Ninth Amendment to the Loan Agreement ("Ninth Amendment"). (See Ninth Amdt. at 5 ("This Amendment shall not become effective until . . . Mehdi Gabayzedeh provides his personal Guaranty of the Liabilities outstanding with respect to the Overadvance Availability in form and substance satisfactory to [LaSalle].").) The Guaranty itself also expressly acknowledged that it was being executed in connection with the Ninth Amendment "as a condition to the extension and continuation of credit by [LaSalle] and [the other lenders party to the Loan Agreement]." (See Guaranty at 1.)

The Ninth Amendment ultimately closed on July 12, 2001, and Gabayzedeh executed both the Ninth Amendment and the Guaranty the same day. Among other things, the Ninth Amendment modified the definition of "Loan Limit" by including an additional $19,600,000 in the calculation of the A/R & I Amount, thus giving the Borrowers greater borrowing headroom (though just for a short time, as the $19,600,000 amount would steadily decrease to $0 by August 3, 2001). (See Ninth Amdt. at 2-3.) Following the closing, LaSalle provided additional funding to the Borrowers pursuant to the terms of the Ninth Amendment.

- 7 -

Through the Guaranty, Gabayzedeh agreed to

> unconditionally guarant[y] . . . the full and prompt payment when due, whether at maturity or earlier, by reason of acceleration or otherwise, and at all times thereafter, of all of the indebtedness, liabilities and obligations of every kind and nature of each Borrower to [LaSalle] and/or Lenders . . . , now or hereafter existing, or due or to become due, . . . including, without limitation, all obligations and liabilities of each Borrower to [LaSalle] and/or [the other lenders] under the Loan Agreement [as amended by the Ninth Amendment].

In relevant part, Rider A to the Guaranty ("Rider A"), which is expressly incorporated into the Guaranty itself (Guaranty at 6), limits the scope of the Guaranty by providing that

> the liability of Guarantor under the Guaranty shall not exceed the amount by which the outstanding "Liabilities" (as defined in the Loan Agreement) exceed the "Loan Limit" . . . , plus (ii) interest on such amount computed at the highest rate provided in the Loan Agreement, plus (iii) all costs and expenses, including, without limitation, all court costs and reasonable attorneys' and paralegals' fees, paid or incurred by [LaSalle] in endeavoring to collect all or any part of Borrower's Liabilities from, or in prosecuting any action against, Guarantor or any other guarantor of all or any part of Borrower's Liabilities.

Rider A at 1.

In signing the Guaranty, Gabayzedeh also agreed to a broad waiver of defenses, in that his "obligations under th[e] Guaranty are unconditional, irrespective of . . . any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor." (Guaranty at 2.) In addition, the Guaranty

provides that LaSalle is free to demand payment from Gabayzedeh under the Guaranty before seeking payment from other sources:

> Upon any default by any Borrower as provided in any instrument or document evidencing all or any part of Borrowers' Liabilities, including, without limitation, the Loan Agreement, [LaSalle] may, at its sole election, proceed directly and at once . . . against Guarantor to collect and recover the full amount or any portion of Borrowers' Liabilities, without first proceeding against any Borrower, or any other person, firm, or corporation, or against any security or collateral for Borrowers' Liabilities.

Guaranty at 3; *see also* Guaranty at 2 ("All amounts payable by Guarantor under the Guaranty shall be payable upon demand by [LaSalle]."). The Court construes the instant action as LaSalle's "demand" that Gabayzedeh pay to LaSalle "[a]ll amounts payable . . . under the Guaranty." (Id.)

By August 10, 2001, the Borrowers' bond deal with UBS Warburg had collapsed, and they had failed to pay down the Overadvance amount (which on that date stood at $4,998,777) as required by the Ninth Amendment. LaSalle forthwith declared a default and accelerated the full amount of the Borrowers' outstanding obligations under the Loan Agreement. Just one month later, on September 10, 2001, all of the Borrowers filed for bankruptcy protection. Filing for bankruptcy constituted an "Event of Default" under the Loan Agreement and made "all of Borrowers' Liabilities . . . immediately and automatically . . . due and payable, without notice of any kind." (*See* Loan Agmt. 29-30.) Shortly after the bankruptcy filing, the

bankruptcy court removed Gabayzedeh as President and Chief Executive Officer of ATI.

As of September 10, 2001, the Overadvance amount had grown to $32,643,466; by July 29, 2002, it had swollen to $103,150,049.

## **DISCUSSION**

Gabayzedeh purports to have identified two "genuine issues of material fact" that should serve to defeat this summary judgment motion: (1) whether LaSalle breached its duty of good faith and fair dealing; and (2) whether the extent of Gabayzedeh's liability under the Guaranty became fixed as of a date certain. Gabayzedeh has mischaracterized his arguments as raising "genuine issues of material fact"; as previously emphasized, Gabayzedeh has _conceded_ LaSalle's version of the material facts in this case. *See* Local Rule 56.1(b)(3)(B). Properly understood, Gabayzedeh's arguments challenge whether, given that "there is no genuine issue as to any material fact[,] . . . the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The Court will address each argument in turn.

### **Good Faith and Fair Dealing**

Gabayzedeh contends that LaSalle "breached its obligation to act in good faith by (a) refusing to disburse funds to American Tissue prior to issuing a proper written notice of default; and (b) requiring Mr. Gabayzedeh to sign the July 12 guaranty before LaSalle would disburse funds. . . ." (Def.'s Resp. in Opp. to Pl.'s Mot. for Summ. J. at 3.) Gabayzedeh is mistaken.

- 10 -

Although "a covenant of good faith and fair dealing is implied in every Illinois contract, . . . [it] has never been an independent source of duties for the parties to a contract." *F.D.I.C. v. Rayman*, 117 F.3d 994, 1000 (7th Cir. 1997)(internal citations and quotation marks omitted). As explained by the Seventh Circuit,

> Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.' Although courts often refer to the obligation of good faith that exists in every contractual relation, this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document. 'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties. When the contract is silent, principles of good faith . . . fill the gap. They do not block use of terms that actually appear in the contract.

*Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990)(citations omitted).

As of early June 2001 and continuing through the closing of the Ninth Amendment on July 12, 2001, the Borrowers' Liabilities exceeded the Loan Limit. The Loan Agreement expressly required the Borrowers to pay down this Overadvance amount "immediately, and without any necessity of a demand by [LaSalle]." (Loan Agmt. at 10.) Failure to do so would constitute an "Event of Default" under the Loan Agreement (*see, e.g.,* Loan Agmt. at 28 (defining "Event of Default" as, *inter alia*, "the failure of any Obligor to pay when due any of the

Liabilities")), thus entitling LaSalle, "in its sole discretion, [to] refuse to advance any Loan requested by or on behalf of a Borrower under th[e] Loan Agreement" (Loan Agmt. at 31).

It is undisputed that the Borrowers failed to pay down the Overadvance that existed prior to July 12, 2001. Under such circumstances, nothing in the Loan Agreement required LaSalle to issue the Borrowers a written notice of default before refusing to make further extensions of credit. In any event, Borrowers can hardly cry foul, as they themselves specifically requested that LaSalle not declare a default for fear that it would endanger the success of the Borrowers' anticipated bond offering through UBS Warburg. Given the clarity of the contract in this case, there is no justification for considering the implied covenant of good faith and fair dealing, cf. Rayman, 117 F.3d at 1000; L.A.P.D., Inc. v. Gen. Elec. Corp., 132 F.3d 402, 404 (7th Cir. 1997)("Litigants may not seek to litigate issues of 'good faith' in lieu of abiding by explicit provisions of contracts."), or, for that matter, a "course-of-dealing" analysis, see Uscian v. Blaccnoeri, 340 N.E.2d 618, 621 (Ill. App. 1975)("Where a contract is clear and unambiguous, however, the conduct of the parties cannot be used to prove that the contract means something other than it says.").

Gabayzedeh also argues that LaSalle somehow breached its duty of good faith and fair dealing in requiring Gabayzedeh to sign the Guaranty as a precondition to the Ninth Amendment. This argument is utterly without merit. The duty of good faith and fair dealing only

applies to *existing* contracts. See, e.g., *United Air Lines, Inc. v. ALG, Inc.*, 912 F.Supp. 353, 358 (N.D. Ill. 1995)("[U]nless a party is alleged to have improperly exercised its *contractually granted* discretion, an opponent cannot defend against a breach of *contract* claim by invoking the duty of good faith and fair dealing.")(emphasis supplied); *Market Street Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588, 594 (7th Cir. 1991)(noting that implied covenant of good faith and fair dealing is addressed to the "performance" of a contract, not its "formation"). It "does not create an overarching duty to be pleasant and amicable in one's business dealings." *Id.*; see also *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992)("Contract law does not require parties to behave altruistically toward each other; it does not proceed on the philosophy that I am my brother's keeper."). The Ninth Amendment constituted an entirely new contract between the Borrowers and LaSalle (and certain other lenders). In taking on fresh obligations in the Ninth Amendment, LaSalle was perfectly within its right to demand compensating consideration for the risk of the Borrowers' default (a very real risk, as it turns out). Likewise, Gabayzedeh was free to refuse to become a party to the Guaranty.

Gabayzedeh agreed to the terms of the Guaranty on July 12, 2001; that he may regret having done so is simply irrelevant to the question of its valid existence and enforceability. The implied

covenant of good faith and fair dealing has no application under the circumstances of this case.

### Scope of the Guaranty

As previously discussed, Rider A provides that the amount subject to the Guaranty "shall not exceed the amount by which the outstanding Liabilities exceed the Loan Limit," plus "interest on such amount computed at the highest rate provided in the Loan Agreement," and all costs, expenses and fees paid or incurred by LaSalle "in endeavoring to collect all or any part of Borrower's Liabilities from, or in prosecuting any action against, Guarantor." (Rider A at 1.) Gabayzedeh contends that Rider A is also subject to an implicit temporal restriction which fixes Gabayzedeh's exposure under the Guaranty as of a date certain. Arguing in the alternative, Gabayzedeh urges that Rider A should be construed to fix his liability as of either: (a) August 10, 2001, the date LaSalle declared a default under the Loan Agreement or (b) the date the Bankruptcy Court removed him as President and Chief Executive Officer of ATI. (*See* Def.'s Resp. in Opp. to Pl.'s Mot. for Summ. J. at 3-4.) Neither argument is convincing.

Gabayzedeh's arguments wither in the face of the plain language of the Guaranty, which clearly and unambiguously states that Gabayzedeh "unconditionally guarantees . . . the full and prompt payment **when due**, whether at maturity or earlier, by reason of acceleration or otherwise, **and at all times thereafter**, of all of the indebtedness, liabilities and obligations of every kind and nature of

each Borrower." (Guaranty at 1 (emphasis supplied).) The Guaranty, aptly titled "*Continuing* Unconditional Guaranty," unmistakably provides that Gabayzedeh has an ongoing, *continuing* obligation to guaranty all of the Borrowers' Liabilities, subject only to the limiting formula of Rider A. Because the Guaranty (which expressly incorporates Rider A) is explicitly drafted without temporal limitations, Gabayzedeh's invitation to interpolate such limitations must be rejected. *Cf. Klemp v. Hergott Group, Inc.*, 641 N.E.2d 957, 962 (Ill. App. 1994)("A court will not rewrite a contract to suit one of the parties, but will enforce the terms as written. There is a strong presumption against provisions that easily could have been included in the contract but were not."); *Chrysler Credit Corp. v. Marino*, 63 F.3d 574, 577 (7th Cir. 1995)(Under Illinois law, "[g]uaranties are contracts to be interpreted in accordance with their clear and unambiguous meaning.").

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is **GRANTED**. The Court hereby enters judgment for LaSalle and declares that Gabayzedeh's guaranty obligations under that certain Continuing Unconditional Guaranty dated July 12, 2001 entered into by and between Gabayzedeh and LaSalle (for itself and as agent for certain other lenders), as described in this opinion, are presently due and owing to LaSalle. To enable the Court to determine the precise amount of Gabayzedeh's guaranty obligations that exist as of the date of this Memorandum Opinion and Order, LaSalle shall

submit affidavit(s) and other appropriate supporting documentation (which shall include reasonably detailed evidence of the costs and fees recoverable under the Guaranty that it incurred in bringing this action) within 14 days of receipt of this Memorandum Opinion and Order; Gabayzedeh shall have 7 days to respond to LaSalle's

**IT IS SO ORDERED.**

--------------------------------------------------
Harry D. Leinenweber, Judge
United States District Court

Date: January 16, 2003